IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **VRABLE IV, INC. dba PEMBROKE PLACE SKILLED NURSING AND REHABILITATION CENTER,**<br><br>　　　　**Plaintiff,**<br><br>　v.<br><br>**SEIU DISTRICT 1199, WV/KY/OH,**<br><br>　　　　**Defendant.** | **Case No. 2:10-cv-00158**<br><br>**Judge James L. Graham**<br><br>**Magistrate Judge Abel** |

**OPINION AND ORDER**

Plaintiff Vrable IV, Inc., dba Pembroke Place Skilled Nursing and Rehabilitation Center ("the Center") filed this action in Franklin County, Ohio Common Pleas Court pursuant to Ohio Revised Code § 2711 et seq., to vacate an arbitration award issued against the Center in favor of employee-grievant Arjaniece Turnage[1] ("Grievant"). Defendant SEIU District WV/KY/OH ("the Union") filed a notice of removal of the action to the United States District Court pursuant to 28 U.S.C. §§ 1441 and 1446. (Def.'s Not. of Removal, doc. #2.) This Court has original jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 185.

Before the Court are the parties' cross-motions for summary judgment: the Union asks this Court to confirm the award; the Center asks this Court to vacate it. The motions are fully briefed and ready for disposition. After careful consideration of the record, this Court **GRANTS** the Union's motion and **DENIES** the Center's motion.

---

[1] This action was consolidated with 2:10-cv-00159 which was voluntarily dismissed.

1

## I.  BACKGROUND

### A. The Collective Bargaining Agreement

The Center, a skilled nursing facility, and the Union, representative of its union employees, are parties to a collective bargaining agreement ("CBA") which was effective from August 13, 2007 to August 31, 2009.  (Doc. # 26-2, Exh. A.)  Under the terms of the CBA, the Center retains the right to "hire, promote, demote, discipline, discharge, transfer, layoff and recall" employees."  (*Id.*, page 3.)  Article 7 of the CBA reserves to the Center "the right to discipline or discharge any employee for just cause," although the term "just cause" is not defined.  (*Id.*, page 7.)  The CBA provides for arbitration of "grievances," which are described as "complaint[s], dispute[s] or controvers[ies] where it is claimed that the Center failed to abide by the terms of the [CBA]."  (*Id.*, page 15.)  The "grievance procedure" is for the purpose of settling disputes over the interpretation or application of the [CBA.]"  (*Id.*)  The CBA permits arbitration of grievances over "discharge or disciplinary suspension" so long as certain time restraints for filing and processing are followed.  (*Id.*, page 18.)  Once the parties agree to an arbitrator—under the process outlined in the CBA—the date and time of an arbitration hearing is set.

Under the CBA, the Arbitrator's powers are limited as follows:

> [Article 17] <u>Section 9</u>:  The Arbitrator's powers shall be limited to the application and interpretation of the Agreement as it is written.  He shall at all times be governed wholly by the terms of the Agreement and he shall have no power or authority to amend, alter or modify the Agreement in any respect.  The Arbitrator's decision shall be final and binding upon the Union, the Center and employees.

(*Id.*)

### B. The Facts Relevant To This Action

The following undisputed facts are contained within the Arbitrator's "Decision and Award" (doc. #22-4, "the Award"), as well as the briefs of the parties (doc. ## 22, 24, 30, and

2

31). Grievant is a State-Tested Nursing Assistant ("STNA") who had been employed by the Center for almost three years prior to her termination. From 7:00 pm. April 15, 2009 through 7:00 a.m. April 16, Grievant was assigned to the East Wing of the Center's rehabilitation floor. By the morning of April 16, there were several complaints by residents against her, and the Center conducted an investigation. As the result of what the Arbitrator determined to be a "sufficient investigation" (the Award, page 37), the Center terminated Grievant and another STNA for "willful and wanton" abuse of two residents (*id.*, page 38, referring to the termination form discharging Grievant[2]). One supervisor was administratively suspended but returned to work with no discipline, and another was terminated for "violation of company policy," including absence from the floor and not making rounds. (The Award, pages 37 – 38.) The Union filed a grievance with respect to Grievant's discharge.

### C. The Arbitrator's Decision

Following a hearing, the Arbitrator determined that the Center, after conducting a sufficient investigation, did not establish "just cause" for Grievant's termination. Based on the evidence before him, the Arbitrator found that the Center's "termination form" stated that Grievant was discharged for "willful and wanton abuse" of Residents A and Z. (The Award, pages 38 – 39.) After reviewing the relevant Ohio and federal statutes, he found that "abuse" is defined as "the willful infliction of injury, unreasonable confinement, intimidation or punishment with resulting physical harm, pain or mental anguish." (*Id.*, page 5.) The Arbitrator then focused his inquiry to whether the Center was justified in

---

[2] This "termination form" is significant, as it forms the basis of the Arbitrator's interpretation of "just cause." This form, although an exhibit to the Arbitrator's "Decision and Award" was not attached as an exhibit to either party's motion or response. The Center does not dispute that the termination form stated that Grievant was discharged for "willful and wanton" abuse.

3

terminating Grievant for the "willful and wanton abuse" of Residents A and Z.[3] With regard to Resident Z, who complained that Grievant told him not to use his call button again, the Arbitrator weighed the evidence and found Grievant's testimony to be more convincing than the other evidence offered. In addition, he found that at most there was a "mis-communication" between Resident Z and Grievant and an "admonishment" to Resident Z from Grievant "not to call again." (*Id.,* page 41) In sum, the Center "did not clearly convince the Arbitrator that Grievant was verbally abusive to Resident Z[.]" (*Id.,* page 42.)

Resident A had complained that Grievant and another STNA deprived her of oxygen when they disconnected Resident A from her in-room tank but did not hook her up to a portable oxygen tank when transporting her down the hall for a shower. The Arbitrator, while finding the facts alleged to be true, found that Grievant's actions were not "willful" abuse. Instead, he found that Grievant, who did not know how to use the portable tank, appeared to have been "certain" that she was proceeding correctly by not using oxygen at all, as evidenced by her alerting the supervisor when she had returned with Resident A so the supervisor could reconnect the oxygen. (*Id., p*age 45.) Important, too, to the Arbitrator's decision was his determination that the Center's management appeared to be aware of Grievant's actions and did nothing to correct them at the time. Two supervisors, who witnessed at least some of this conduct, stated that "nothing appeared to be amiss." (*Id.*, page 43.) "Neither acted to prevent any apparent abuse which is their responsibility as much or more than it is for everyone at the Center." (*Id.*)

In sum, the Arbitrator found that Grievant's actions did not constitute "willful abuse," and, therefore, the Center's termination was not justified. In addition, the

---

[3] The Arbitrator also reviewed the complaints from the other residents to confirm that the Center was correct in not taking action regarding those complaints. (The Award, page 39.)

4

Arbitrator found that Grievant's actions, while "unfortunate," occurred "[u]nder the noses of two supervisors" and that Grievant should not be made a "scapegoat[ ]." (*Id.,* page 47.) The Arbitrator ordered that Grievant be reinstated to her former position with back pay, less any unemployment compensation and interim earnings. (*Id.,* page 48.)

The Union, in response to the Center's subsequent refusal to reinstate Grievant, filed its action to enforce the decision in Franklin County Common Pleas Court. As noted, *supra*, that action has been removed to this Court. The Union asks for the Court to confirm the award, and the Center asks this Court to vacate it.

## II. STANDARD OF REVIEW AND ANALYSIS

### A. The Arbitrator's Decision

The role of the federal courts in enforcing arbitration awards is limited. "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements" because, otherwise, public policy in favor of settling labor disputes by arbitration "would be undermined if courts had the final say on the merits of the awards." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596 (1960). The *Enterprise* Court cautioned against a court's substituting its own interpretation of the contract for that of the arbitrators. *Id.* at 599. Where an arbitrator declines to be confined to "interpretation and application" and instead "dispense[s] his own brand of industrial justice," a court could refuse to enforce an award. *Id.* An arbitrator's award is legitimate "so long as it draws its essence from the collective bargaining agreement." *Id.* at 597.

In *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 31 (1987), the Court looked again at when a federal court may refuse to enforce an arbitration award rendered under a collective bargaining agreement. Clarifying the line between an award

5

that "draws its essence" from the contract and one that reflects the arbitrator's own brand of "industrial justice," the *Misco* Court noted as follows:  "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Id.* at 38.  More recently, in *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001), the Court went further: when "an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's 'improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce the award." *Id.*  at 509 (quoting *Misco*, 484 U.S. at 39).

In *Michigan Family Resources, Inc. v. Service Employees International Union Local 571M*, 475 F.3d 746 (6th Cir. 2007) the Sixth Circuit reviewed the "refinements" to the law as expressed by *Misco* and *Garvey* and explicitly overruled its former four-part inquiry into the "essence" of an arbitration award, as previously articulated in *Cement Divs. Nat'l Gypsum Co. v. United Steelworkers, Local 135*, 793 F.2d 759, 766 (6th Cir. 1986).  Now the proper, "procedural aberration" inquiry is thus:

> Did the arbitrator act outside his authority by resolving a dispute not committed to arbitration?  Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award? And in resolving any legal or factual disputes in the case, was the arbitrator arguably construing or applying the contract?

*Id.* at 753 (internal quotation marks omitted).  Noting the Supreme Court's "repeated insistence" that "serious arbitral errors" must be tolerated by the federal courts, "judicial consideration of the merits of a dispute is the rare exception, not the rule."  *Id.*  In most cases, "it will suffice to enforce the award that the arbitrator appeared to be engaged in interpretation, and if there is doubt we will presume that the arbitrator was doing just that." *Id.*

6

In *Michigan Family,* the Sixth Circuit enforced the arbitrator's award, affirming the district court's decision, noting that there were no suggestions of fraud, conflict of interest, or dishonesty "infect[ing]" the arbitrator's decision or the arbitral process. *Id.* at 754. Further, there was no dispute that "the collective bargaining agreement committed this grievance to arbitration" or that the arbitrator was properly selected. *Id.* Finally, the Court answered the remaining question—Was the arbitrator "arguably construing" the collective bargaining agreement?—in the affirmative.

> The arbitrator's ten-page opinion has all the hallmarks of interpretation. He refers to, quotes from and analyzes the pertinent provisions of the agreement, and at no point does he say anything indicating that he was doing anything other than trying to reach a good-faith interpretation of the contract.
>
> Neither can it be said that the arbitrator's decision on the merits was so untethered from the agreement that it casts doubt on whether he was engaged in interpretation, as opposed to the implementation of his "own brand of industrial justice."

*Id.* In *Totes Isotoner Corp. v. Int'l Chemical Workers Union Council/UFCW Local 664C*, 532 F.3d 405 (6th Cir. 2008), the Court applied the same review to an arbitrator's supplemental labor arbitration award and found that it exceeded the scope of the arbitrator's authority. There, although it was "undisputed that the parties did not submit a grievance for resolution under the 2002 CBA[,]" the arbitrator based his decision on the 2002 version anyway. *Id.* at 416. "Consequently, in reaching the question of the 2002 CBA, the Arbitrator acted outside his authority and therefore the supplemental award was properly vacated even under the narrow standard announced by *Michigan Family Resources*." *Id. See also Peterbilt Motors Co. v. UAW Int'l Union*, 219 F. App'x 434 (6th Cir. 2007) (vacating an arbitrator's award upon a finding that the arbitrator acted outside his authority to reach a question not arbitrable under the collective bargaining agreement).

7

Turning to the present matter, this Court finds the Union's Motion for Summary Judgment to be well-taken and that the Arbitrator's award must be enforced. Similar to *Michigan Family*, there is nothing in the record before this Court to suggest that fraud, a conflict of interest, or dishonesty taints the Arbitrator's decision or the process itself. Neither party disputes the selection of the Arbitrator or that the CBA commits to arbitration this wrongful-termination grievance. While the Center disputes the Arbitrator's reasoning and finding, there is no credible dispute that the Arbitrator was acting within the scope of his authority by hearing the grievance.

Primarily, the Center argues that the Arbitrator's award "failed to draw its essence" from the CBA. (P.'s Mem. In Opp., Doc. #34, pages 4 – 5.) In so arguing, the Center applies the over-ruled four-part *Cement Divs. Nat'l Gypsum Co.* test by way of citation to pre-*Michigan Family* case law. The proper inquiry, as discussed *supra*, is to determine if the Arbitrator was "arguably construing" the CBA. Like the ten-page opinion rendered by the *Michigan Family* arbitrator, here the Arbitrator's 48-page decision has "all the hallmarks of interpretation." He reviewed at least 27 exhibits, heard live testimony, and reviewed post-hearing briefs. (Decision, pages 1 – 2.) He refers to the CBA itself, as well as pertinent regulations and statutes.

There is no evidence that the Arbitrator's decision on the merits was "so untethered from the agreement that it casts doubt on whether he was engaged in interpretation, as opposed to the implementation of his own brand of industrial justice." *Michigan Family,* 475 F.3d at 754. The Center argues that the Arbitrator went too far afield "by creating an additional 'equal protection' requirement that does not exist in the just cause standard expressed in the parties' collective bargaining agreement." (P.'s Mot. Summ. J., pages 16 – 17.) But the Center agrees that the term "just cause" is not defined by the CBA (P.'s Memo. Opp., page 8) and, moreover, the Center agrees that "labor arbitrators have very broad

8

authority to interpret—or even, misinterpret—the language of collective bargaining agreements (*id.*, page 9). What the Center truly disputes is the Arbitrator's interpretation of the term "just cause," not that the Arbitrator failed to engage in interpretation at all. Even if, as the Center argues, the Arbitrator imposed "additional criteria in his interpretation of 'just cause,'" that does not cast doubt on whether he was engaged in interpretation. Further, as evidence of its claim that the Arbitrator "acted outside his authority", the Center argues that the Arbitrator gave more credence to "the live testimony of witnesses . . . over contemporaneous statements made by residents[.]" (P.'s Mem. Opp., pages 6 – 7.) But an arbitrator is permitted to weigh evidence and make determinations— that is the very purpose of arbitration. If he commits a legal error by drawing an impermissible inference from one kind of evidence, an arbitrator's decision is still left intact by the courts. "An arbitrator does not exceed his authority every time he makes an interpretive error; he exceeds that authority only when the collective bargaining agreement does not commit the dispute to arbitration." *Equitable Resources, Inc. v. United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied Indus. and Service Workers Int'l Union, AFL-CIO*, 621 F.3d 538, 545 (6th Cir. 2010) (quoting *Michigan Family*, 475 F.3d at 756).

This Court is not persuaded that this matter falls within the "rare exception" of arbitration awards that requires judicial consideration of the merits. The CBA specifically states that the "grievance procedure" is for "the purpose of settling disputes over the interpretation or application of the [CBA.]" (Doc. # 22-2, Exh. A, page 3.) Section 9 of the CBA limits the Arbitrator's authority to "the application and interpretation of the Agreement as it is written." The Agreement permits the Center to terminate employees for "just cause" but fails to further define that term. The Arbitrator has the authority to interpret that term. That the Center disagrees with the Arbitrator's interpretation is not

9

enough to permit this Court to review the merits of his decision, even if "the arbitrator made serious, improvident or silly errors in resolving the merits of the dispute." *Michigan Family*, 475 F.3d at 753.

### B. Public policy argument

In the alternative, the Center asks this Court to vacate the arbitration award on public policy grounds. "Reinstatement of the Grievant[ ] where [the Center's] investigation substantiated the resident 'abuse' claims violates established public policy protecting nursing home residents from abuse." (P.'s Mot. Summ. J., page 18.) Arguing that reinstatement violates both Ohio and federal laws and regulations, the Center points to Ohio Revised Code § 3721.13(A)(2) and 42 C.F.R. § 483.13(b), which state, respectively, as follows:

> **3721.13 Residents' rights.**
> (A) The rights of residents of a home shall include, but are not limited to, the following: . . .
> (2) The right to be free from physical, verbal, mental, and emotional abuse and to be treated at all times with courtesy, respect, and full recognition of dignity and individuality; . . . .
>
> **§ 483.13 Resident behavior and facility practices.**
> (b) *Abuse*. The resident has the right to be free from verbal, sexual, physical, and mental abuse, corporal punishment, and involuntary seclusion.

Pursuant to these regulations, the Center states that it has a duty to keep residents free from abuse, and, it argues, it fulfilled that duty by "immediately investigating the complaints regarding Grievant[ ] and after substantiating the complaint, terminating Grievant[ ]." (P.'s Mot. Summ. J., page 21.) "The Arbitrator's decision to reinstate [the] Grievant[ ] under such circumstances not only violates these clearly enumerated public policies, but also places [the Center's] licensure with the state and federal Medicare program in future jeopardy." (*Id.*, citing to 42 C.F.R. § 483.13(C)(1).) In support of this contention, the Center cites to two non-binding state decisions, *County of DeWitt v.*

10

*American Federation of State, County and Municipal Employees, Council 31*, 699 N.E.2d 163, 293 Ill. App.3d 634 (Ill. Ct. App. 4th Dist. 1995) and *Gogebic Medical Care Facility v. AFSCME Local 992, AFL-CIO*, 531 N.W.2d 728, 209 Mich. App. 693 (Mich. Ct. App. 1995), as well as other state decisions.  The Center offers no additional argument in support.

"[W]hen an arbitration award is challenged on public policy grounds, the court must determine whether the arbitrator's interpretation of the contract jeopardizes a well-defined and dominant public policy, taking the facts as found by the arbitrator." *Board of County Comm'rs v. L. Robert Kimball & Assocs.*, 860 F.2d 683, 686 (6th Cir. 1988), cert. denied, 494 U.S. 1030 (1990).  "The public policy must be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *MidMichigan Regional Med. Center-Clare v. Professional Employees Div. of Local 79, Service Employee Int'l Union, AFL-CIO*, 183 F.3d 497 (6th Cir. 1999) (quoting *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 766 (1983)) (internal quotation marks omitted).

There is no question that both Ohio law and federal law prohibit the abuse of nursing home residents.  The question before the Court is whether requiring a nursing home to reinstate a nursing assistant who was found by an arbitrator *not* to have been willfully abusive violates that policy. *See Interstate Brands Corp., Butternut Bread Div. v. Chauffeurs, Teamsters, Warehousemen and Helpers Local Union No. 135*, 909 F.2d 885, 893 (6th Cir. 1990) (holding that the relevant question is not whether the grievant's conduct violated public policy, but whether award of reinstatement does so).

As discussed, *supra*, the Arbitrator's decision draws its essence from the CBA, and he was within his authority to interpret the CBA's undefined term of "just cause" for

11

termination. In doing so, he found that Grievant had not committed "willful abuse," and found, therefore, that her termination was improper.

In *MidMichigan*, the Sixth Circuit reversed the district court's decision vacating an arbitration award that reinstated a nurse whom the arbitrator had found to be negligent. Noting that "[e]ven highly skilled professionals err on occasion," the Court found it "clear that it cannot violate the public policy of Michigan to contract to retain a nurse guilty of some acts of carelessness." 183 F.3d at 504. *See also Columbia Gas of Ohio, Inc. v. Utility Workers Union of America*, 329 Fed. Appx. 1, 2009 WL 1351679 (6th Cir., May 15, 2009) (finding the safety concerns presented by utility worker's misconduct did not establish the kind of public policy that would be violated by reinstatement after a 14-month suspension).

Here, the Arbitrator's decision requiring Grievant's reinstatement does no more than place her back at the Center under the supervision of its management. As noted by the Union (and not disputed by the Center), Grievant does not fall within the federal regulation prohibiting employment of individuals found guilty of abuse by a court of law or entered into the state nurse-aid registry for abuse of residents. (D.'s Mem. Opp., page 10, citing 42 CFR § 483.13(c)(1)(ii).) Under the CBA, the Center contracted for the retention of union employees whose discharge was not for just cause. Similar to the contract provision in *MidMichigan,* this contract provision does not violate public policy.

### C. Attorney Fees and Prejudgment Interest

The Union, in its motion, seeks an award of pre-judgment interest. (D.'s Mot. Summ. J., doc. # 22-1, pages 16 – 17.) The Center does not respond to this argument in its Memorandum in Opposition. (*See* P.'s Mem. Opp., doc. # 31.) In support of its request for pre-judgment interest, the Union argues that Grievant has been "separated from [her] position for well over a year and [has] experience[d] monetary loss as a result." (D.'s Mot.

Summ. J., page 17.) In addition, the Center "has benefitted from the delayed reinstatement and payment of back wages" that were ordered by the Arbitrator's Award. (*Id.*)

This Court has discretion to grant or deny prejudgment interest. *Mills V. River Terminal Ry. Co.*, 276 F.3d 222, 228 (6th Cir. 2002). Prejudgment interest is used to make a party whole when the adverse party fails to comply with an arbitration award. *IBEW Local No. 573 v. Steen Elec., Inc.*, 232 F.Supp.2d 797, 805-06 (N.D. Ohio 2002). *See also EEOC v. Kentucky State Police Dep't*, 80 F.3d 1086, 1098 (6th Cir. 1996) (observing that "it is ordinarily an abuse of discretion *not* to include pre-judgment interest in a back-pay award[.]") (emphasis in original).

Here, the Arbitrator awarded Grievant reinstatement and back pay (less unemployment compensation and interim earnings) on October 30, 2009. (The Award, page 48.) The Court finds an award of prejudgment interest is appropriate in this case to make the Grievant whole. In the absence of a federal statute establishing the appropriate rate of interest, the rate shall be 4% per annum, as provided under Ohio law[4], and shall be applied from the date of the Arbitrator's decision, October 30, 2009, until the date this Court enters its judgment. *See Quaker Oats Co. v. Int'l Chem. Workers Union*, No. 92-5070, 1993 WL 47199, at *3 (6th Cir. Feb. 23, 1993) (applying state law to determine prejudgment interest rate).

### D. Attorney Fees

Although the Union did not request attorney's fees in its motion for summary judgment, it did request attorney fees in its counter-claim. (Answer and Counterclaim, doc. # 5.) In general, a prevailing party may not recover attorney's fees in the absence of a

---

[4] Ohio Revised Code § 1343.03 provides a calculation for interest rates not stipulated in a contract. That rate of interest is defined in O.R.C. § 5703.47 and it is tied to the "federal short-term rate." In 2009, the interest rate was 5.0%, and in both 2010 and 2011, the interest rate was 4.0%. As the prevailing party, the Union, has neglected to provide the correct calculation, this Court will apply the 4.0% interest rate, as most of the time delayed has occurred during that period.

13

statute or enforceable contract providing for a fee award. *Monroe Auto Equip. Co. v. Int'l Union*, 981 F.2d 261, 269-70 (6th Cir. 1992). There is no applicable statute with regard to enforcing an arbitration award, and the Court is unaware of any contract term providing for fees. The Union makes no "bad faith" argument that would permit such relief, *see Ray A. Scharer and Co., Inc. v. Plabell Rubber Prod., Inc.*, 858 F.2d 317, 320 (6th Cir. 1988) ("[A]n award of attorney's fees . . . must be limited to truly egregious cases of misconduct."), and this Court declines to address this issue *sua sponte*. As a result, the Union's request for attorney's fees is **DENIED**.

### III. CONCLUSION

This Court hereby **GRANTS** the Motion for Summary Judgment of Defendant SEIU District 1199 (doc. # 22) to the extent that it confirms the Arbitrator's Decision and Award. The Court also **GRANTS** Defendant SEIU District 1199's request for pre-judgment interest from October 30, 2009 to the date of this judgment, at 4.0 % per annum. The Court **DENIES** Defendant SEIU District 1199's request for attorney's fees. The Court also **DENIES** the Motion for Summary Judgment of Plaintiff Vrable IV, Inc. (doc. # 24). The Clerk shall enter final judgment in favor of the Defendant. The costs of the action are assessed against the Plaintiff.

**IT IS SO ORDERED.**

March 22, 2011                                               /s/ James L. Graham
                                                                                                Judge James L. Graham
                                                                                                United States District Court